UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ZACHARY PULERA,

              Plaintiff,

      v.                              Case No. 15-C-461

VICTORIA SARZANT, et al.,

              Defendants.

**ORDER GRANTING REMAINING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

      This case arises out of the unsuccessful suicide attempt of Plaintiff Zachary Pulera in the early morning hours of April 23, 2012, while he was an inmate at the Kenosha County Jail.  Pulera attempted to hang himself with a bed sheet.  Alerted by one of the prisoners on Pulera's cellblock, correctional officers were able to cut him down before he expired, but not before he lost consciousness and became unresponsive.  Pulera was transported to the Neuro-Intensive Care Unit at Froedtert Hospital in Milwaukee where he was revived.  Claiming that his suicide attempt was caused by the deliberate indifference and/or negligence of the correctional and health care staff of the jail, Pulera commenced this action against the County; the Sheriff; various administrative staff members, supervisors, and correctional officers; and the doctor, nurses, and their respective employers with whom the County contracted to provided health care to inmates, along with their insurers.  According to his second amended complaint, Pulera seeks monetary damages for, *inter alia*, serious emotional and psychological distress; permanent brain damage and memory problems;

pain and suffering; loss of wages and earning capacity; cost of medical care; treatment and services; and loss of enjoyment of life. Second Amended Compl., Dkt. No. 59 at ¶ 145.

After a series of delays caused by difficulties encountered by the plaintiff in identifying the various defendants, the case was transferred to the undersigned in December 2017. Since that time, various claims and some of the defendants have been dismissed on motion or by stipulation. On January 9, 2019, the court granted summary judgment in favor of Dr. Karen Butler, the physician employed by Advanced Correctional HealthCare, Inc. (ACH), who was providing medical care to inmates at the time of Pulera's attempted suicide. Presently before the court are the motions for summary judgment of the remaining defendants. These include Nurses Erica Rea, Denise Gilanyi, Markella Reed, Sylvia Summers-Sgroi, and Lyndsay Hauck (collectively, the Nurse Defendants); their employer Visiting Nurse Community Care, Inc. (VNCC); VNCC's insurer Cincinnati Specialty Underwriters Insurance Company; Correctional Officers Victoria Sarzant, Shane Gerber, Dennis Sawilla, Bruce Clemens, Duane Corso, Darron Newton, Cheryl Slater, Dennis Remus, Robert Pallamolla, Charles Smith, Marck Schlecht, and David Beth (collectively, the County Defendants); Kenosha County and its insurer Wisconsin Municipal Mutual Insurance Company; and ACH. For the reasons that follow, those motions will also be granted.

## BACKGROUND

In the early morning of April 21, 2012, Pulera was arrested on a charge of felony bail jumping for violating the conditions of his bond by consuming alcohol. Pulera had been released on bail in October of 2011 on a state charge of Battery to a Law Enforcement Officer, in violation of Wis. Stat. § 940.20(2). Pulera arrived at the Kenosha County Jail around 2:00 a.m. following his arrest on April 21. At intake, the transporting officer observation report and a medical/mental

screening visual observation report were completed. The report stated that Pulera did not exhibit any risk or harmful behavior during the arrest or transport, that he did not make any suicidal gestures or statements during the arrest or transport, and that he was prescribed Clonazepam and Tramadol. Dkt. No. 186-1 at 1, 3. Pulera was initially placed in a holding cell at the jail to sober up because he was intoxicated. The Zone One Protective Holding Report noted that intoxication and/or drug use was suspected and that Pulera was uncooperative, combative, and seemed to have difficulty or an inability to follow instructions. Pulera later pounded on the door, claiming he was cold, and Correctional Officer (CO) Victoria Sarzant gave him a jacket. Sarzant completed a protective holding report, which stated that Pulera was not suicidal.

The conclusion that Pulera was not suicidal while in the holding cell is disputed by Pulera's cousin Edward Burke, who was arrested with Pulera for driving under the influence. Burke testified that he was placed in a holding cell across the hallway from Pulera and saw him drag his thumb across his throat, which Burke interpreted as a suicidal gesture. Burke also stated that Pulera made several statements to the effect of "I'm done; it's over," Burke Depo. at 14:1–6, 14:23–15:3, Dkt. No. 202-26 at 5, which he also interpreted as meaning he intended to harm himself. Burke claims that he told multiple correctional officers of his concern but was unable to specifically identify any officer to whom he conveyed such information. Once they were removed from the holding area, Burke, who was released from custody that morning, had no further contact with Pulera.

At 7:00 a.m., Admission & Release Specialist Shane Gerber began the booking process for Pulera. Gerber reviewed the intake documents and confirmed that Pulera did not have an MH-1 Special Instruction, a computer entry that indicates whether the inmate had previously been placed on a Level 1 Suicide Watch. Gerber then conducted a booking interview with Pulera and asked him

3

questions from a medical questionnaire form. Pulera responded "no" to the following questions: "[h]ave you ever attempted or contemplated suicide" and "are you contemplating suicide now." Dkt. No. 185-1 at 1. Pulera was then placed in a general population cell located in the H-Block section of Zone 5.

Pulera had answered two of the questions differently when he was booked into the Jail in October 2011. At that time, he stated he had been in a mental institution in Kenosha for "drug problems" three years earlier and that "a long time ago" he had contemplated suicide. Dkt. No. 202-7 at 1. There is also evidence that he had been on Level 1 Suicide Watch during that period of incarceration at the Kenosha County Jail. On October 7, 2011, Pulera was seen by a crisis worker for "depressed mood/anxiety." Dkt. No. 202-8 at 1. He tearfully reported experiencing depression over the fact that his brother had killed himself a month earlier. The crisis worker reported that Pulera "verbally contract[ed] for his safety," was advised of the services her agency provided, and agreed to tell the guards if he started to feel depression. The report further states, "They are going to take him from Level 1 down to Level 2 Watch." *Id.* But this was more than six months before the events giving rise to Pulera's current claims.

With respect to his incarceration that began in the early morning hours of April 21, 2012, Pulera submitted the first of three inmate medical requests (IMR) at 12:15 p.m. It read, "I need my [Clonazepam] and my [Tramadol]. My family is dropping them off. For my pain [illegible word] and [depression]." Dkt. No. 202-18 at 1. Nurse Andrea Rae responded as follows to his request: "While you are here you are under the care of the jail M.D. You will be notified of the medications brought in." *Id.* Pulera's prescription medications, Clonazepam and Tramadol, were dropped-off by Pulera's brother at the jail at 2:35 p.m. Nurse Rae counted the pills and determined that 26 of

4

the Clonazepam pills and 39 of the Tramadol pills were missing from the containers even though the prescriptions had been filled the previous day. Rae spoke with Dr. Karen Butler regarding Pulera's medication, and was told by Dr. Butler not to make the prescriptions available to Pulera because of the significant number of missing pills. Although Pulera's brother testified that he called several times and spoke to nursing and correctional staff about Pulera's request for medication, Pulera's depression, and the possibility of Pulera's suicide, he was unable to identify the person or persons to whom he spoke.

Pulera submitted a second IMR at 8:10 p.m. stating, "My [heart] [hurts]. I can't [breathe]. I need my [meds] or I can die. My heart is pounding they are here. I need you to please bring me my [meds] A.S.A.P. Thank you." Dkt. No. 202-19 at 1. After receiving this IMR, Nurse Denise Gilanyi spoke with Pulera's zone officer who reported that he was not in any distress, and responded to Pulera's IMR as follows: "The jail MD has not set up any medications at this time." *Id.*

The following day, April 22, 2012, Pulera submitted his third and final IMR at 2:30 p.m. stating, "I can't eat, sleep. I am [throwing] up and I am dizzy. I can't [breathe]. I need my blood [pressure] [taken], please see me. My brother and mother just died. I need my [Clonazepam]. I am sick." Dkt No. 202-20 at 1. Nurse Markella Reed asked a CO to see how Pulera was doing and was told that Pulera was walking around, making phone calls, and speaking with other inmates. Reed responded "[y]our blood pressure will be checked," *id.*, and contacted Dr. Butler at 4:45 p.m. to discuss Pulera's medical condition and IMR. Dr. Butler ordered that Pulera's vitals be taken and any abnormalities be reported back to her. At 8:00 p.m., Nurse Sylvia Summers-Sgroi checked Pulera's temperature, pulse, respiration, blood pressure, and heart rate and did not find them to be abnormal.

At 1:45 a.m. on April 23, 2012, CO Bruce Clemens and CO Duane Corso heard a commotion in Zone 5, where Pulera was housed, followed by yelling by an inmate in Pulera's block that someone is hanging. Clemens went to the nearby control room to open the H-block door and request assistance over the jail's radio system while Corso went through the now open H-block door to Pulera's cell. During approximately the next 30 seconds, jail supervisor Darron Newton arrived, obtained a 911 knife from Clemens from where it was stored in the control room, went to Pulera's cell along with Clemens, entered Pulera's cell, and cut the bed sheet that Pulera was using to hang himself while Clemens and Corso attempted to take the pressure off the ligature around Pulera's neck. After cutting Pulera down and placing him on the ground, 911 was called at 1:47 a.m., and Nurse Summers-Sgroi arrived at Pulera's cell to provide him emergency medical care.

## LEGAL STANDARD

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "[A] 'metaphysical doubt' regarding the existence

of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non moving party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A.     The Nurse Defendants and VNCC

Pulera's remaining claims against the Nurse Defendants and VNCC are: 1) deliberate indifference to his mental health needs in violation of his rights under both the United States and Wisconsin constitutions; 2) a *Monell* claim against VNCC; and 3) state law negligence against VNCC. Pulera's negligence and State constitutional claims will be addressed at the end of the court's order.

#### 1.     U.S. Constitutional Claims Against the Nurse Defendants

The Fourth Amendment governs the treatment of arrestees during the period of confinement between arrest without a warrant and a probable cause determination. *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992). The Due Process Clause of the Fourteenth Amendment governs from the probable cause determination until conviction for a crime, at which point the Cruel and Unusual Punishment Clause of the Eighth Amendment applies. *Bell v. Wolfish*, 441 U.S. 520, 531 (1979). In the court's order granting Dr. Butler's motion for summary judgment, Dkt. No. 169, the court

applied the Fourth Amendment's objective unreasonableness standard to Pulera's constitutional claims against her because it appeared that he was not in federal custody and no evidence was offered that either a federal or state judicial officer had determined there was probable cause that authorized Pulera's custody at the time of the events giving rise to the action. Dkt. No. 169 at 11. Neither the defendants nor the plaintiff have submitted any evidence since that time showing that Pulera's status at the time of the events at issue was otherwise. Consequently, the court will analyze Pulera's constitutional claims under the Fourth Amendment's objective unreasonableness standard.

Under the Fourth Amendment, "[t]he issue is whether the state actor's response to the arrestee's medical needs was objectively unreasonable and caused the harm of which the arrestee complains." *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013) (internal quotations and brackets omitted). In deciding whether a state actor's response to such a plaintiff's medical needs was objectively unreasonable, courts look to four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). The key issue in a case such as this is notice: "the intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low." *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011). Thus, the key question as to each individual defendant is whether he or she had notice that Pulera was suicidal. The court will address each of the Nurse Defendants in turn.

### a.　Erica Rea

Nurse Rea's actions—counting Pulera's medications after they were dropped off at the jail by his brother, speaking with Dr. Butler regarding the significant number of missing pills in his prescriptions, and responding to Pulera's first IMR—were objectively reasonable under the circumstances.  Pulera's IMR stated, "I need my [Clonazepam] and my [Tramadol].  My family is dropping them off.  For my pain [illegible word] and [depression]."  Dkt. No. 202-18 at 1.  The IMR did not notify Rea that Pulera currently felt depressed, was having any suicidal thoughts, or was experiencing any symptoms of withdrawal from being denied access to his medications.  Although Pulera states that his brother informed the guards when dropping of his medication that Pulera was feeling depressed and that two of his family members had just passed away, there is no indication in the record that this information was relayed or directly told to Rea.  Even if it was, however, Rea was justified in relying upon Pulera's own statements and responses to questions put to him by the correctional and healthcare staff.  In any event, the decision to deny Pulera access to his medications was made by Dr. Butler, not by Rea, and the court has already concluded that Dr. Butler's decision was reasonable given the substantial number of pills missing from the prescriptions which had been filled the previous day.  Dkt. No. 169 at 11–12.  Rea was not authorized to give Pulera his medications without Dr. Butler's permission as it is the policy of the jail "that the management of chemically dependent inmates is individualized under the direction of the jail Physician."  Dkt. No. 150-13 at 1.  Finally, Pulera's own expert, Dr. White, did not think that Rea's actions were unreasonable:

> Yeah, I think the first nurse [Rea] that really just collected up the bottles, and counted them, and called Doctor Butler, and, you know, said, half of them are

> missing, I mean, I think she could have been more forthcoming in terms of her response to the inmate, . . . I think it was fine.

Dr. White Depo. at 176:2–8, Dkt. No. 180-2 at 8. Because there was no indication in her interactions with Pulera that he was at serious risk to attempt suicide, Nurse Rea's actions were not objectively unreasonable. *See Belbachir v. Cty. of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) (nurse's failure to prevent plaintiff from committing suicide not objectively unreasonable when the nurse had no knowledge that plaintiff was suicidal).

### b. Denise Gilanyi

Nurse Gilanyi's actions were likewise objectively reasonable. Gilanyi received Pulera's second IMR that stated, "My [heart] [hurts]. I can't [breathe]. I need my [meds] or I can die. My heart is pounding they are here. I need you to please bring me my [meds] A.S.A.P. Thank you." Dkt. No. 202-19 at 1. In response, Gilanyi spoke with Pulera's zone officer who reported he was not in any distress and that he just wanted his medications. Dkt. No. 138-1 at 2. Gilanyi then responded to Pulera's IMR as follows: "The jail MD has not set up any medications at this time." Dkt. No. 202-19 at 1. Pulera's IMR did not portray any thoughts of suicidal ideation, but only expressed physical discomfort. More importantly, upon observation by an officer, Pulera did not exhibit any signs of distress. Again, there was no report that Pulera was threatening or even suggesting suicide. Although Pulera argues that Gilanyi's reliance on the officer's observations is inappropriate, he cites no law in support of this assertion. Gilanyi's reliance on the officer's assessment and subsequent actions were not unreasonable as Pulera's IMR and the officer's observations did not give notice to Gilanyi that there was a significant likelihood that he may imminently seek to take his own life.

### c. Markella Reed

Nurse Reed's actions were also objectively reasonable. Reed responded to Pulera's third IMR that stated, "I can't eat, sleep. I am [throwing] up and I am dizzy. I can't [breathe]. I need my blood [pressure] [taken], please see me. My brother and mother just died. I need my [Clonazepam]. I am sick." Dkt No. 202-20 at 1. Reed responded, "Your blood pressure will be checked," *id.*, and his vitals were checked later that day after Reed's shift ended. Reed also took efforts to check on Pulera's condition, speaking with an officer after receiving Pulera's IMR who stated that Pulera was walking around, making phone calls, and asking for the remote, and did not appear to be in any apparent distress. Further, Reed spoke with Dr. Butler, and was advised to order Pulera's vital signs be checked and that any abnormalities be reported. When Pulera's vitals were checked after Reed's shift, they appeared normal. Pulera's complaints of physical pain and discomfort did not give notice to Reed that he posed an imminent risk of harm to himself. *See Estate of Novack v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("[S]trange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel."). Pulera points out that all of the nurses, including Reed, had access to Pulera's medical files that document the mental health concerns that arose more than six months earlier when Pulera was in custody. But those records showed Pulera's mental condition in early October of 2011, not on April 23, 2012. The prior records also showed that Pulera knew how to get help when he thought he needed it. From the time of his arrest early on April 21, Pulera gave no indication he was thinking of harming himself to any of the nursing staff he has sued for failing to prevent him from doing so less than forty-eight hours later. They cannot be faulted for failing to read his mind.

11

### d. Sylvia Summers-Sgroi

For the same reasons as the other nurses, Nurse Summers-Sgroi's actions were not objectively unreasonable. Summers-Sgroi took Pulera's vitals and found them to be normal. Pulera had the opportunity at that time to tell Nurse Summer-Sgroi about anything that was bothering him, but said nothing. He exhibited no signs that he posed an imminent risk to commit suicide, nor did he express to her that he was contemplating suicide. Although Pulera contends that Summers-Sgroi should have known he was suicidal as she spoke with his brother over the phone and was informed as much, Pulera did not report he was suicidal at intake, did not indicate he was suicidal on the medical/mental health screening form, never stated in any of his IMRs that he was suicidal, and never directly told Summers-Sgroi, or any of the other nurses for that matter, that he was suicidal. Further, when she took Pulera's vitals there were no signs or indications that he was contemplating or at risk of committing suicide. Consequently, her actions were not objectively unreasonable.

### e. Lyndsay Hauck

Nurse Hauck did not have any contact with Pulera during any of her shifts during the time pertinent to this case. In addition, Pulera stated in his response brief that he "does not dispute dismissal of Lyndsay Hauck from the case." Pl.'s Resp., Dkt. No. 199 at 1 n.1. Accordingly, Hauck will be dismissed as a defendant.

### 2. *Monell* claim against VNCC

*Monell* established that a municipality may be liable under § 1983 for money damages only if the unconstitutional act that harmed the plaintiff was "caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority."

*Haywood v. Wexford Health Sources*, No. 16-CV-3566, 2017 WL 783000, at *2 (N.D. Ill. Mar. 1, 2017) (citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). Although VNCC is a private corporation that has contracted with the Wisconsin Department of Corrections, it is subject to a *Monell* claim just like a municipality would be. *See, e.g.*, *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).

Pulera's claim that VNCC's failure to adequately train its nurses "to provide adequate care to depressed patients undergoing withdrawal symptoms," Pl.'s Resp. Br., Dkt. No. 199 at 22, and its "de facto policy of allowing medical staff to rely on medically untrained correction staff to assess medical issues," *id.* at 25–26, violated his constitutional rights fails because "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("Although a municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation, there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights."). As the court has found that the Nurse Defendants' actions did not violate Pulera's constitutional rights, there is no underlying violation which was caused by VNCC's alleged failure to train. The Nurse Defendants provided adequate care to Pulera based on the information they had available and Pulera has presented no case that a nurse's reliance on observations of correctional officers in the course of care of inmates violates an inmate's constitutional rights. In addition, Pulera has not provided evidence that there is a pattern of constitutional violations by the Nurse Defendants. Pulera's single-incident liability argument, hypothesized by the Supreme Court

13

in *Canton v. Harris*, 489 U.S. 378 (1989), is untenable. There, "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). Pulera's argument fails, however, as the VNCC defendants have undergone training and the specific circumstances surrounding their care for Pulera is more nuanced, distinguishing the situation at hand from the one hypothesized in *Canton*. *See Connick*, 563 U.S. at 67 ("A second significant difference between this case and the example in *Canton* is the nuance of the allegedly necessary training."). Accordingly, summary judgment is granted in favor of VNCC with respect to Pulera's *Monell* claim. And since the claims against VNCC and the Nurse Defendants fail, it necessarily follows that the claims against their insurer, Cincinnati, fail as well.

## B.     The County Defendants

Pulera's remaining claims against the County Defendants are: 1) violation of his United States and Wisconsin constitutional rights by the individual County Defendants; 2) a *Monell* claim against Kenosha County; and 3) state law negligence against the County Defendants. The County Defendants contend, as a threshold argument, that they are not liable for Pulera's deliberate attempt to kill himself as a matter of law because their failure to act did not cause his injuries or, alternatively, for reasons of public policy. County Defs.' Br. in Opp., Dkt. No. 182 at 11–12. Noting the apparent incompatibility between the notion that mentally sane individuals are responsible for their own deliberate actions and the premise underlying Pulera's lawsuit that the guards who failed to prevent him from harming himself should be held liable to him in money damages for the harm he caused, the County Defendants argue Pulera's claims against them should

14

be dismissed as a matter of law. *See Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 887–90 (E.D. Wis. 2006).

The Seventh Circuit has rejected this argument, however, noting that while "'competent persons' have a due-process 'right to refuse lifesaving hydration and nutrition,' . . . this right does not extend to incarcerated persons who have been deemed incompetent." *Miranda v. Lake Cty.*, 900 F.3d 335, 349 (7th Cir. 2018) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997)). Rather, the court has held that for those incarcerated, "jails have a duty 'to prevent the prisoner from giving way' to the 'unusual psychological strain' caused by incarceration." *Id.* (quoting *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006)). This argument therefore fails and the court will turn to the question whether Pulera has evidence capable of supporting his claims.

### 1. U.S. Constitutional Claims Against the Individual County Defendants

Pulera's claims against the County Defendants will also be analyzed under the Fourth Amendment's objective unreasonableness standard as discussed earlier. Although the County Defendants assert that Pulera had a probable cause determination, they point only to the hearing held on October 12, 2011, that was in relation to an October 4, 2011 charge for battery to law enforcement officers, firefighters, or commission wardens. The County Defendants have not provided any evidence that a probable cause hearing was held in relation to Pulera's April 21, 2012 arrest. Consequently, Pulera's constitutional claims are governed by the Fourth Amendment.

### a. Pulera's Initial Intake and Screening

### i. Victoria Sarzant

Officer Sarzant's actions towards Pulera while he was in a holding cell were not objectively unreasonable. Pulera spoke with Sarzant and informed her that he was cold, and she provided him

with a jacket. Sarzant completed a Zone One Protective Holding Report that indicated Pulera was not suicidal, and she was never made aware of any suicidal behavior or thoughts by Pulera during the time that she directly interacted or was responsible for Pulera. Although Pulera states that he communicated suicidal thoughts to a person in an adjacent holding cell, there is no evidence that Sarzant overhead these communications or was otherwise directly made aware of them. Further, Pulera stated that he never communicated this directly to Sarzant. In addition, Pulera cannot establish that Sarzant's treatment of him caused him any harm, which is necessary to state a claim under § 1983. *Whitlock v. Bruggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (stating § 1983 "must be read against the background of tort liability," including that "the act must be the cause-in-fact of the injury, i.e., the injury would not have occurred absent the conduct") (internal quotations and citations omitted). Sarzant saw Pulera at booking in the early morning hours of April 21; his attempted suicide did not occur until almost forty-eight hours later. Consequently, the motion for summary judgment is granted with respect to Sarzant.

### ii.    Shane Gerber

Pulera's claim against Officer Gerber fails for similar reasons. During Pulera's intake interview with Gerber, Pulera stated that he has never contemplated suicide and that he was not currently contemplating suicide. There were no statements or actions by Pulera that would have notified Gerber that he posed an imminent suicide risk during his interaction with him. Although Pulera asserts that Gerber's actions were objectively unreasonable because he did not check Pulera's prior incarceration records, as noted above, those records would only have informed Gerber of his condition some six months earlier in October of 2011, not April of 2012. Asking Pulera about his condition directly was a more reasonable way of determining his condition at that time. In addition,

as was the case with Sarzant, Pulera cannot establish that Gerber's actions directly caused him harm, since they occurred more than forty-eight hours before he attempted to take his life. Accordingly, summary judgment is granted in regards to Gerber.

### iii.    Dennis Zawilla

"'[Section] 1983 does not allow actions against individuals merely for their supervisory role of others,' *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000), [because] '[i]ndividual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue.'" *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003) (quoting *Kelly v. Mun. Courts of Marion Cty.*, 97 F.3d 902, 909 (7th Cir. 1996)). Zawilla was the third shift supervising officer who signed off on Pulera's intake reports and oversaw Sarzant and Gerber. Because Pulera cannot establish that Zawilla's actions deprived him of his rights or acted in a manner besides his supervisory role of Gerber and Sarzant, summary judgment is granted in favor of Zawilla.

### b.    Response to Pulera's Suicide Attempt

Bruce Clemens, Duane Corso, and Darron Newton's responses to Pulera's suicide attempt were not objectively unreasonable. Upon hearing a commotion in Zone 5, where Pulera was housed, Clemens went to the control room to open the H-Block door and requested emergency assistance over the radio. At the same time, Corso proceeded towards Pulera's cell, manually opening one door and then proceeding through the door opened by Clemens to Pulera's cell. After Corso arrived at Pulera's cell, Newton arrived, obtained a 911 knife from Clemens in the control room, and arrived at Pulera's cell about fifteen to twenty seconds after Corso had arrived. Clemens proceeded to open the cell door, and then Corso lifted Pulera up while Newton cut the ligature that

17

was strangling Pulera. Following this, emergency responders were contacted, and Summers-Sgroi arrived at the scene as a result of Clemen's earlier call.

Although Pulera criticizes Clemens' decision to remain in the control room, he did so to open doors that allowed the officers access to his cell and to request emergency assistance over the radio that is heard by all correctional officers and nurses in the jail. Regarding Corso's decision not to enter Pulera's cell until another officer was present, Corso testified officers are trained not to enter cells alone for their own safety. "There is 'no rule of constitutional law [that] requires unarmed officials to endanger their own safety in order to protect a prison inmate.'" *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019) (quoting *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006)). Corso also testified that he was concerned, given Pulera's position in relation to the door, that if he were to reach into Pulera's cell that it would prevent the cell door from opening, further delaying officers. Unlike the officers in *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984 (7th Cir. 2012), here medical attention was called for by Clemens over the radio to the jail nurses once he was aware that Pulera needed medical attention. Further, immediately after the officers addressed the more pressing issue of rescuing Pulera from his suicide attempt, they contacted outside emergency responders. In addition, as opposed to taking four minutes to prepare a cell entry, the officers that saved Pulera responded to his suicide attempt in under a minute. Other courts addressing this issue have observed that "[t]he Constitution does not require an individual officer to intervene immediately in an apparent suicide without sufficient support where doing so would jeopardize his own safety." *Arenas*, 922 F.3d at 624. "All that can be expected is that guards act responsibly under the circumstances that confront them," *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004), and here Clemens, Corso, and Newton did so: upon being alerted to Pulera's suicide attempt, the officers

18

responded quickly and cut him down promptly. Consequently, summary judgment is granted in favor of Clemens, Corso, and Newton.

### c. Cheryl Slater, Dennis Remus, Robert Pallamolla, Charles Smith, Mark Schlecht, and David Beth

The plaintiff does not dispute dismissal of Cheryl Slater, Dennis Remus, Robert Pallamolla, Charles Smith, Mark Schlecht, and David Beth. Pl.'s Resp. Br., Dkt No. 203 at 1 n.1. Accordingly, the County Defendants' motion for summary judgment is granted with respect to these defendants and they are dismissed.

### 2. Violation of 42 U.S.C. § 1983 by Kenosha County under *Monell*

Pulera's *Monell* claim against Kenosha County that it has failed to adequately train Admission & Release Specialists or correctional officers that come into contact with suicidal inmates fails for similar reasons as his claim against VNCC: the actions of Kenosha County's employees did not result in a violation of Pulera's constitutional rights. Further, while Pulera claims alleged shortcomings in Kenosha County's policies and practices, he has presented no evidence that the alleged problems have resulted in a pattern of consistent failures to provide constitutionally adequate care for prisoners. Although Pulera also points to a memo issued in February of 2011 by Captain Falduto of the Kenosha County Jail in response to a series of attempted suicides, "[t]he bare fact that other inmates attempted suicide does not demonstrate that the jail's policies were inadequate, that officials were aware of any suicide risk posed by the policies or that officials failed to take appropriate steps to protect [an inmate]." *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014). Consequently, the County Defendants' motion for summary judgment will be granted with respect to Pulera's *Monell* claim.

**C.      Advanced Correctional Healthcare, Inc.**

ACH asserts that Pulera's sole remaining claim against it—liability under *Monell*—should be dismissed on the merits because Pulera cannot prove an underlying constitutional act by its employee, Dr. Butler. Pulera did not file a response to ACH's motion, and has stipulated to entry of summary judgment in favor of ACH. ACH Stipulated Facts at ¶ 4, Dkt. No. 192. Accordingly, ACH's motion for summary judgment will be granted.

**D.      Wisconsin Constitutional Claims**

The Wisconsin Supreme Court generally interprets "provisions of the Wisconsin Constitution consistent with the Supreme Court's interpretation of parallel provisions of the federal constitution." *State v. Ninham*, 2011 WI 33, ¶ 45, 333 Wis. 2d 335, 797 N.W.2d 451. Because the court has found that the defendants' actions were not in violation of the United States Constitution, and Pulera has not put forth any argument that the defendants' actions violated protections provided by the Wisconsin Constitution that are not provided by the federal Constitution, Pulera's Wisconsin constitutional claims against the defendants will be dismissed.

**E.      Negligence Claims against VNCC and The County Defendants**

Pulera argues that VNCC owed him a duty to provide medical care due to its custodial relationship and that its failure to provide that care contributed to his suicide attempt that resulted in his injuries. VNCC contends that it cannot be found liable under the doctrine of superseding cause because Pulera's intentional suicidal act breaks the line of causation. Regarding the County Defendants, Pulera alleges that they owed him a duty to protect him from self-harm and their failure to take action caused his suicide attempt that resulted in his significant brain damage. Although governmental employees are usually immune for acts that involve the application of discretion or

judgment, Pulera asserts that the County Defendants are not immune because "(1) the conduct involved a non-discretionary, ministerial duty imposed by law and; (2) there existed a known present danger to Pulera of such force that the time, mode, and occasion for performance left no room for the exercise of judgment." Pl.'s Resp. Br., Dkt. No. 203 at 26.

Having determined that Pulera's federal claims should be dismissed on summary judgment, the court will decline to exercise jurisdiction over Pulera's remaining state law claims. "A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary." *Coleman v. City of Peoria, Illinois*, No. 18-1742, 2019 WL 2240575, at *12 (7th Cir. May 24, 2019). "Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Id.* As all of Pulera's claims within the court's original jurisdiction have been dismissed, Pulera's state law claims for negligence are dismissed without prejudice for lack of federal jurisdiction.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment, Dkt. Nos. 171 (The Nurse Defendants and VNCC), 181 (The County Defendants), and 190 (ACH), are **GRANTED** with respect to Pulera's federal claims and the Clerk is directed to enter judgment in favor of the defendants, dismissing Pulera's federal claims with prejudice. The court declines to exercise jurisdiction over Pulera's remaining state law claims, and they are **DISMISSED without prejudice**.

**SO ORDERED** this  12th  day of June, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court